ANTHONY QUINN and KATHERINE QUINN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Quinn v. Commissioner
Docket No. 4871-70
United States Tax Court
T.C. Memo 1974-64; 1974 Tax Ct. Memo LEXIS 253; 33 T.C.M. (CCH) 310; T.C.M. (RIA) 74064; March 18, 1974, Filed. Earl C. Crouter, for the petitioners. Stephen W. Simpson, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a $23,144.59 deficiency in petitioner's Federal income tax for the calendar year 1964. The issues remaining for decision are (1) whether petitioners have met the requirements of section 274 [1] for substantiation of their deduction of travel expenses (including meals and lodging) incurred in connection with preliminary research for making a motion picture, and (2) the correct allocation of petitioner-husband's agent's commissions between foreign taxable income and foreign income excludible under section 911. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Anthony and Katherine Quinn, then husband and wife, were residents of Los Angeles County, California, at the time they filed their petition herein. They filed their 1964 joint Federal income tax return with the district director of internal revenue at Los Angeles. Katherine *255 Quinn is a party to this action solely because she filed a joint return with her husband, and hereinafter "petitioner" refers to Anthony Quinn. In 1964 petitioner was a motion picutre actor, writer, producer and director. He has been involved in the motion picture industry since 1937, and has been producing his own pictures since 1953. Petitioner was engaged in the production of the motion picture "Zorba the Greek" during part of 1964. Prior to the filming of this picture, Mr. Cacoyannis, the director, asked petitioner to take the role of Zorba in the film, which petitioner did. At that time Cacoyannis was unable to guarantee petitioner's usual compensation, with the result that petitioner assumed the additional role of co-producer to protect his interest. [2] Petitioner and Cacoyannis initially dealt with United Artists, which agreed to finance and release the picture if it could be done for less than $770,000. As co-producer in "Zorba the Greek," petitioner traveled to Paris to begin looking for the best possible cast for the picture. In Paris he talked with Simone Signoret *256 about costarring with him in the film. After leaving Paris, petitioner went to Belgrade to finish filming another picture. In Belgrade he asked Sam Shaw, a photographer for Life magazine, to help him research the character of Zorba. Petitioner's then secretary, petitioner's son, Duncan Quinn, and Shaw all joined petitioner in Belgrade. Petitioner, accompanied by this group, traveled from Belgrade to Athens by train, to conduct research and make preparation for filming "Zorba the Greek." Petitioner and his research group traveled by train because petitioner wanted to be close to and a part of the Greek people in order to develop a background for the picture. Petitioner felt that the presence of his son was an important research aid since the character Zorba had to develop a father-son relation with another character in the film, and petitioner's son presented the proper vehicle through which to develop that relationship or emotion in the character of Zorba. From Athens the research party went to the Island of Rhodes where they spent approximately ten days looking for a location to shoot the film. Petitioner thought there were benefits in shooting the film on Rhodes, since he had *257 many friends on the Island and was a close friend of the governor of Rhodes. Petitioner's party returned to Athens to report their findings to Cacoyannis, taking with them hundreds of photographs of possible locations and other information. However, by the time they arrived in Athens, Cacoyannis had decided to make the picture in Crete in a little village called Xania. The group then flew to Xarachian where petitioner, upon arriving, hired an automobile and drove through the country to Xania. It required about a month to six weeks to find a cast and the proper location and to allow petitioner sufficient time to research the character of Zorba. It was at this time that petitioner asked Jack Gaffney, his stand-in for many years, to join the group in preproduction activities. While in Xania petitioner rented a house because the accommodations at the only hotel were very poor. Forthermore, he provided his own furniture and furnishings, because these were not available with the house. Approximately a week before the actual shooting of the picture began, United Artists terminated their interest in the film. This left petitioner and Cacoyannis liable for about $300,000 spent in *258 preparation for the picture. In hopes of saving the picture, petitioner made several telephone calls to New York to find another company to finance the film. As a result of these phone calls, Darryl Zanuck loaned petitioner the necessary money on a personal basis. However, the picture "Zorba the Greek" was eventually financed and released by Twentieth Century Fox. Numerous expenses were incurred in connection with all of the activities carried on by petitioner and his research party. For example, petitioner and his party purchased air and train tickets, paid for hotel rooms and meals (including tips), rented automobiles and boats, rented a house in Xania, and paid for the long distance telephone calls made to procure financing for the film. Petitioner was paid only $150 in expenses per week by the production company, instead of his usual $1,000 per week. Petitioner paid the rest of these expenses himself. Petitioner has no receipts and he made no records (substantially contemporaneous or otherwise) of his various expenditures. In January or February of 1973, petitioner had his then secretary prepare a schedule showing his approximation of the amounts he expended on the Zorba *259 trips. [3]
In 1964 petitioner received $100,000 cash from Twentieth Century Fox. In addition, he was entitled to a 1/3 participation in the profits from "Zorba the Greek" for his work in connection with that motion picture. [4] Petitioner reported only $87,300 of the $100,000 cash as gross income on his 1964 Federal income tax return. He did not report $12,700 of the $100,000 in the belief that that amount represented reimbursement for out-of-pocket expenses which constituted ordinary and necessary business expenses that he was entitled to deduct.Respondent determined that the $12,700 was compensation for services rendered, and that no part of it was allowable as a business expense deduction because petitioner had failed to meet the substantiation requirements of section 274. Accordingly, respondent increased petitioner's income by $12,700. During 1964 petitioner paid his agent a commission equal to ten percent of his gross salary. The same *260 fee was paid whether the jobs the agent procured for petitioner were to be performed within or without the United States. During that year petitioner made some films where he decided to defer a portion of his compensation. However, petitioner's agent did not wish to defer any of his commissions, and therefore petitioner paid him the total amount of his commissions on the amount petitioner earned, not the amount petitioner received. Petitioner's accountant determined that the proper proportion of the agent's commissions attributable to petitioner's foreign income excludible under section 911 was ten percent of petitioner's excludible income of $20,000. Therefore, petitioner allocated $2,000 of his agent's commissions to excludible income and did not claim the $2,000 as a deduction. Respondent determined that since the agent's commission exceeded 10 percent of petitioner's income for the year, petitioner's allocation was improper, and reallocated petitioner's agent's commissions according to section 1.911-2(d) (6), Income Tax Regs. Accordingly, respondent increased petitioner's income by $970.44, the additional amount which respondent determined represented nondeductible commissions. *261 A OPINION Petitioners contend they are entitled to deduct the travel expenses in issue (including meals and lodging while away from home) as ordinary and necessary business expenses within the meaning of section 162, and, further, that they have met the substantiation requirements of section 274. Respondent asserts that petitioners have failed to show that they met the requirements of section 274. We hold that regardless of whether petitioner's travel expenses constitute ordinary and necessary business expenses deductible under section 162, petitioners have failed to substantiate those expenses by adequate records or other sufficient evidence, and that therefore the expenses are disallowed pursuant to section 274(d) and the regulations thereunder. Section 274(d) provides in part that "no deduction shall be allowed * * * under section 162 or 212 for any traveling expense (including meals and lodging while away from home) * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense * * *, (B) the time and place of the travel, * * * [and] (C) the business purpose of the expense * * *." *262 Section 1.274-5(b) (2), Income Tax Regs., provides that the elements to be proved with respect to travel expenses are (i) the amount of each separate expenditure for travel away from home, such as the cost of transportation or lodging, (ii) dates of departure and return for each trip away from home, and number of days away from home spent on business, (iii) destination or locality of travel, described by name of city or town, and (iv) business reason for travel or nature of the business benefit derived as a result of travel. The taxpayer must substantiate each element of an expenditure by adequate records or by sufficient evidence corroborating his own statement. Section 1.274-5(c) (1), Income Tax Regs. To meet the "adequate records" requirements of section 274(d), a taxpayer must maintain an account book or similar record and documentary evidence which, in combination, are sufficient to establish each element of an expenditure. Section 1.274-5(c) (2) (i), Income Tax Regs. Documentary evidence, such as receipts, paid bills or similar evidence sufficient to support an expenditure, is required for (a) any expenditure for lodging while traveling away from home, and (b) any other expenditure *263 of $25 or more, except that in the case of transportation charges, documentary evidence is not required if not readily available. Section 1.274-5(c) (2) (iii), Income Tax Regs.
Where a taxpayer fails to maintain adequate records or provide documentary evidence, he must establish such elements (i) by his own statement, whether written or oral, containing specific information in detail as to such elements, and (ii) by other corroborative evidence sufficient to establish such element. Section 1.274-5(c) (3), Income Tax Regs.
Respondent concedes that petitioner is entitled to $25 a day for the 52 days he was away from home on business in Greece and Crete without regard to his failure to substantiate any such expenses, [5] presumably in accordance with Rev. Rul. 63-13, 1963-1 C.B. 69. This ruling provides in part that if an employer reimburses his employee for subsistence expenses not exceeding $25 per day while away from home on business, such reimbursement shall be deemed substantiated within the meaning of section 1.274-5(c), Income Tax Regs., if (1) the employer reasonably limits payment of such travel expenses to those which are ordinary and necessary in the conduct *264 of his trade or business, and (2) the elements of time, place and business purpose of the travel are substantiated. See section 1.274-5(f), Income Tax Regs.
Clearly in this case petitioner has completely failed to meet the substantiation requirements of section 274(d) and is not entitled to any travel expense deduction except for that amount conceded by respondent. Petitioner kept no records, adequate or otherwise, and no receipts of any kind. The only evidence we have is his uncorroborated statement and an exhibit, prepared by a secretary other than the one who traveled with petitioner in 1964, wherein petitioner set forth his approximations of the amounts spent for the travel (including meals and lodging while away from home) in issue. The limitations provided in section 274(d) supersede the doctrine of Cohan v. Commissioner, 39 F.2d 540 (C.A. 2, 1930), which held that, where the evidence indicated that a taxpayer had incurred deductible travel expenses but the exact amount could not be determined, the *265 Court should make a close approximation and not disallow the deduction entirely. "Section 274(d) contemplates that no deduction shall be allowed a taxpayer for such expenditures on the basis of such approximations or unsupported testimony of the taxpayer." Section 1.274-5(a), Income Tax Regs. Therefore, we hold that petitioners are not entitled to deduct any travel expenses in excess of those conceded by respondent. Petitioner's exhibit indicates that, by his estimate, $1,300 was spent for rental of camera equipment, purchase of film, development of film, etc. This particular expense does not fall within the special substantiation requirements of section 274. While petitioner has presented no documentary evidence or corroborating testimony regarding this expense, we have no reason to doubt his veracity. Therefore we hold that petitioner is entitled to deduct $1,300 for the cost he incurred for camera rental, purchase of film, development of film, etc. Petitioner also argues that the travel expenses in issue are deductible under section 174 as research and experimental expenditures. Research and experimental expenditures are defined in the regulations as "expenditures incurred *266 in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. * * * [The] term does not include * * * expenditures paid or incurred for research in connection with literary, historical, or similar projects." Section 1.174-2(a) (1), Income Tax Regs. The research incident to the filming of "Zorba the Greek" falls into the latter classification, and therefore is not deductible under section 174. Next we consider the issue whether petitioner's allocation or respondent's allocation of petitioner's agent's commissions to income excludible under section 911 is the correct allocation. Petitioner concluded that since he paid a 10 percent commission to his agent on his entire gross income, he should attribute 10 percent of his excludible income (10 percent of $20,000, or $2,000) to commissions on such income and classify the $2,000 as nondeductible under section 911(a). However, in the year in issue petitioner's agent's commissions exceeded 10 percent of petitioner's gross income. During that year petitioner made some films where he decided to defer a portion of his compensation. However, petitioner's *267 agent did not wish to defer any of his commissions, and therefore petitioner paid him the total amount of his commissions on the amount petitioner earned, not the amount petitioner received. As a result, instead of disallowing a flat 10 percent of the $20,000 excludible income in this year, respondent made another allocation. Respondent, in precise accordance with regulations section 1.911-2(d) (6), allocated total commissions attributable to petitioner's foreign gross income in proportion to the ratio that the amount excludible under section 911 ($20,000) bears to petitioner's total foreign gross income for that year. Petitioner makes no contention that the regulations are invalid. In the absence of any such contention, or any other reason advanced why the respondent's allocation is erroneous, we hold that respondent's determination is correct. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue. ↩
2. Petitioner indicated that he and Cacoyannis were equal partners in the production company. ↩
3. The secretary who prepared petitioner's summary of travel expenses was not the same one who traveled with petitioner during 1964. ↩
4. There is no indication in the record that he had any ownership interest in the film. ↩
5. The amount conceded by respondent appears to ignore the $150 a week petitioner testified he was paid for living expenses by the production company. ↩